## GEORGE E. WARREN CORPORATION v. UNITED STATES.

### Customs Appeal No. 3755.

Court of Customs and Patent Appeals.
June 12, 1934.

Curtis, Fosdick & Belknap, of New York City (James F. Curtis, of New York City, of counsel), for appellant.

Charles D. Lawrence, Asst. Atty. Gen. (John T. Fowler, Jr., Sp. Asst. to Atty. Gen., and Ralph Folks, Sp. Atty., of New York City, of counsel), for the United States.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

This is an appeal from a judgment of the United States Customs Court overruling the protest of appellant against the assessment and collection by the collector of customs of a duty of ten cents per hundred pounds upon a cargo of coal imported in the year 1932 from the Union of Soviet Socialist Republics, hereinafter referred to as Russia.

By the provisions of the Tariff Act of

1930, § 201, par. 1650 (19 USCA § 1201, par. 1650), coal, such as that involved, is made admissible duty free, but section 601 of the Revenue Act of 1932 (26 USCA § 3601 note) imposed a tax upon a number of articles "unless treaty provisions of the United States otherwise provide," (subparagraph (a), which tax, subparagraph (b) of the section provides: "* * * Shall be levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930, and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act. * * *" Among the articles so to be taxed is coal of the character at bar, but the subparagraph relating to coal, unlike any of the other "tariff" paragraphs of the Revenue Act of 1932, provides that the duty shall not be imposed upon coal imported from countries with which, during the calendar year preceding the importation, the balance of trade in coal was favorable to the United States.[1]

Under this balance of trade provision, rulings by the Treasury Department were made directing the admission duty free, during the year 1932, of coal from Canada and Mexico. Also an early ruling, made in view of the existence of "most-favored nation" treaties, between the United States and Germany and the United States and Great Britain, directed the admission of coal from those countries duty free, although the balance of trade in coal with them was, during the year 1931, in their favor, but this was later revoked and taxes were assessed upon such coal. We have recently held, affirming a judgment of the United States Customs Court, that such taxes were illegally assessed, basing our decision upon the "most-favored nation"

doctrine. United States v. Domestic Fuel Corp. et al., 71 F.(2d) 424, 21 C. C. P. A. (Customs) ——, T. D. 47010.

It is agreed that during the calendar year 1931 the balance of trade in coal between the United States and Russia was favorable to the latter country. It is also agreed that no most-favored nation treaty existed between the United States and Russia at the time of the transaction here involved. Indeed, no treaty whatsoever existed between the two countries at that time, and no diplomatic relations were being maintained (although there were some interchanges of commerce), no such relations having been established with the Union of Soviet Socialist Republics until the latter part of the year 1933.

The contention of appellant here is based solely upon the doctrine declared by the Supreme Court of the United States in The Five Per Cent Cases (U. S. v. M. H. Pulaski Co.), 243 U. S. 97, 37 S. Ct. 346, 61 L. Ed. 617, it being urged that the effect of the provision of section 601 (a), "unless treaty provisions of the United States otherwise provide," is to suspend entirely the imposition of the tax upon coal, without reference to the country from which it may be imported, "so long as the United States continues to have most-favored nation clauses in any of its treaties with countries from which coal is imported and so long as coal from Canada and Mexico or any other country is admitted free of duty under the balance-of-trade provision of the law."

It is thus to be seen that appellant, while unable to rely upon any treaty with Russia, seeks to obtain the benefit of treaty provisions which the United States have with other nations.

---

[1] The full text of the pertinent portions of the Revenue Act of 1932 (section 601 [26 USCA § 3601 note]) here involved read:

"Sec. 601. Excise Taxes on Certain Articles

"(a) In addition to any other tax or duty imposed by law, there shall be imposed a tax as provided in subsection (c) on every article imported into the United States unless treaty provisions of the United States otherwise provide.

"(b) The tax imposed under subsection (a) shall be levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930, and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act, except that— * * *

"(c) There is hereby imposed upon the following articles * * * imported into the United States, a tax at the rates hereinafter set forth, to be paid by the * * * importer: * * *

"(5) Coal of all sizes, grades, and classifications (except culm and duff), coke manufactured therefrom; and coal or coke briquettes, 10 cents per 100 pounds. The tax on the articles described in this paragraph shall apply only with respect to the importation of such articles, and shall not be imposed upon any such article if during the preceding calendar year the exports of the articles described in this paragraph from the United States to the country from which such article is imported have been greater in quantity than the imports into the United States from such country of the articles described in this paragraph."

We are of opinion that there is a clear distinction between The Five Per Cent Cases, supra, and the case at bar, and that the issues of the two controversies are entirely different.

Those cases arose under the 1913 Tariff Act. Subsection 7 of section 4 J of that act (38 Stat. 192, 196), read: "That a discount of 5 per centum on all duties imposed by this Act shall be allowed on such goods, wares, and merchandise as shall be imported in vessels admitted to registration under the laws of the United States: Provided, That nothing in this subsection shall be so construed as to abrogate or in any manner impair or affect the provisions of any treaty concluded between the United States and any foreign nation."

At the time of the passage of the 1913 act, there existed between the United States and, in the words of the Supreme Court, "nearly all the commercial countries of the world," treaties of a reciprocal character whereby discrimination in duties levied upon goods imported in their respective vessels was definitely renounced, in so far as the nationality of the vessels was concerned, and it was provided, in substance, that the duties which should be levied upon merchandise conveyed to the ports of the United States by foreign vessels should be the same as were levied upon the same goods when conveyed by vessels of United States registry and vice versa. These were direct agreements and were independent of the most-favored nation provisions, which were also parts of many of the same treaties.

In The Five Per Cent Cases (Pulaski v. U. S.), 6 Cust. App. 291, T. D. 35508, this court held that the discount of 5 per cent. should be allowed upon all merchandise imported in vessels of United States registry and also upon all merchandise imported in registered vessels of other countries with whom we had treaties providing that the vessels, and cargoes therein, of the contracting parties should have equality of treatment in the levy and collection of tonnage and other duties. This court also considered and discussed the most-favored nation clauses of such treaties.

The Supreme Court, in The Five Per Cent Cases, supra, reversed this court's decision, and, without any reference whatever to the most-favored nation doctrine, but, basing its holding, as we interpret the opinion, solely upon the treaty provisions relating to nondiscrimination between vessels, held that the section did not grant the discount to any—not even to goods imported in vessels of United States registry. In other words, the proviso of subsection 7, supra, was held to suspend the operation of the subsection's so-called main clause.

The language of Justice Holmes, speaking for the court, was: " * * * If the statute bore the meaning attributed to it below, it granted the discount to the nations having treaties of reciprocity, even if those treaties were only contracts. As, in our opinion, the subsection means what it says, it grants the discount to none."

There was not involved in those cases any question with respect to the dutiable status of merchandise imported in the vessels of countries with which the United States had no reciprocal treaties. Obviously, however, the discount could not apply there. Hence the broad expression, "It grants the discount to none."

We are asked to hold here that the effect of the provision in paragraph (a) of section 601, Revenue Act of 1932 (26 USCA § 3601 note), "unless treaty provisions of the United States otherwise provide," is to suspend the operation of the coal tax paragraph.

In other words, it is argued, in effect, that, by analogy with the holding that a proviso, respecting treaties, in the 1913 Tariff Act, suspended a grant of privilege, or favor, to vessels of the United States, the proviso in the Revenue Act of 1932 suspends the levy of the coal tax without reference to the country from which it is imported.

We are unable to agree that the cases are analogous, or that the judgment sought by appellant would be proper.

Except for the existence of treaties unabrogated, or unrepealed in an act of Congress itself, Congress certainly has full authority to levy duties upon importations of merchandise discriminatory as between nations. For reasons of comity between nations, as well as for the purpose of shielding the government's revenues, and broadly protecting its interests, the authority has not often been exercised, but this does not imply the nonexistence of the authority itself. The possibility of its exercise by any and all sovereign nations probably presents the only reason for having most-favored nation treaties. If discrimination were not possible, there would be no occasion for agreements not to discriminate.

Furthermore, if a nation with which no most-favored nation treaty exists must be permitted to have access to a country's mar-

kets upon the same terms as a country with which there does exist such a treaty, because of that treaty, what necessity exists for separate and distinct commercial treaties between nations? Most-favored nation treaties are always reciprocal in character, whether they be executory or self-executing. We have none with Russia. Russia may lay whatsoever condition her government may choose to lay upon importations of coal from the United States. Because we have contracts whereby we agree not to discriminate in duties upon the goods of one country, the consideration being that that country accords us the same treatment, are we in any wise legally bound to extend the terms of that treaty to a country which is in no wise bound to reciprocate? We think the answer obviously must be in the negative.

However, the question in this case is not one of authority, but rather is one of whether such authority was exercised.

It is our opinion that Congress did clearly exercise its authority to levy a tax upon importations of coal into the United States, but expressly excepted from such tax coal coming from countries as definitely described, by the balance of trade provision, as if they had been mentioned by name, and that the limitation, "unless treaty provisions of the United States otherwise provide," was intended only to preserve this nation's existing contracts individually made with other nations. These constituted the two classes of nations—and the only nations—to whose goods the exception from the tax applied.

In The Five Per Cent Cases, supra, there were involved treaty contracts, which were a part of the law of the land, by which our government had become bound not to accord discriminatory favors, of the kind named in the act, to our own vessels, and the Congress was held to have observed and maintained those contracts by the insertion of the proviso above quoted, which operated to postpone the application of the subsection of which it was a part.

In the case of U. S. v. Domestic Fuel Corp., supra, there were involved treaty contracts, which were a part of the law of the land, by which we had agreed with certain countries to accord to their merchandise the same rates of duty that we accorded to the merchandise of other countries, and Congress observed and maintained those contracts by using the phrase, "unless treaty provisions of the United States otherwise provide."

The instant case differs from both. In The Five Per Cent Cases, supra, the Supreme Court held that it was impossible to enforce the discount provision, in accordance with the intent of Congress, in any instance, without violating treaties with many nations, and therefore concluded that the legislation was not intended to be effective so long as such treaties continued to be the law.

In the instant case the statute is effective without violating any treaty whatsoever.

When Congress in section 601 of the Revenue Act of 1932 said that the taxes therein provided should be levied, "unless treaty provisions of the United States otherwise provide," we think the intention was merely to recognize and maintain such contracts as existed between the United States and other nations, and that the phrase has no application to importations from countries with which no treaties exist that do "otherwise provide." Surely only those who are parties to a contract are entitled to the benefits of it, only they are bound by it, and they are bound only to each other.

If nations not parties to a treaty are to obtain its favors and benefits in the same manner as those which are parties, we apprehend much confusion will arise in the realm of international commerce and law.

Let us suppose, for the purpose of illustration, that one of the nations with which the United States has a most-favored nation treaty by reason of which, under our decision in the Domestic Fuel Corp. Case, supra, coal is entitled to free entry, should, for some reason, elect to abrogate or modify that treaty and impose duties discriminating against the products of the United States. Could it logically be maintained that we would continue bound to admit their coal duty free? We are unable to conceive our government as being so bound. But such would be the inevitable result if the principle here contended for by appellant should be adopted and applied.

We had no treaty with Russia in 1932 which provided "otherwise" than that a tax might be levied upon coal imported therefrom, and Russia was not, by any contract with the United States, in the category of most-favored nations. We owed no legal obligation to Russia and Russia none to us respecting the duties or taxes which should be levied upon products exchanged in commerce between the two countries.

There is nothing in the legislative history of the involved statute, substantially all of which history is recited in our opinion in the Domestic Fuel Corp. Case, supra, which leads us to conclude that Congress intended

that there should be any construction of the act other than that here given it.

The judgment of the United States Customs Court is affirmed.

Affirmed.